UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M-11-940

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

LIN FENG XU,

        Defendant.

- - - - - - - - - - - - - - - - - -X

C O M P L A I N T

(18 U.S.C. § 554)

EASTERN DISTRICT OF NEW YORK, SS:

        RYAN BESSEY, being duly sworn, deposes and says that he is a Special Agent with the United States Fish & Wildlife Service ("Service"), duly appointed according to law and acting as such.

        Upon information and belief, on or about September 19, 2011, within the Eastern District of New York and elsewhere, the defendant, LIN FENG XU, did knowingly conceal and attempt to export from the United States, merchandise, articles and objects contrary to United States law and regulations, to wit: the Defendant knowingly concealed and attempted to export articles and objects containing and comprised of Elephant Ivory transported and concealed in his carry-on luggage for a flight from New York to China, knowing that the export of such ivory was contrary to law, specifically 16 U.S.C. 1528(c).

        (Title 18, United States Code, Sections 554 and 2).

The source of my information and the grounds for my belief are as follows:[1]

1. I am employed as a Special Agent ("SA") with the Department of the Interior, U.S. Fish and Wildlife Service ("FWS"), Office of Law Enforcement. I am presently assigned to the Valley Stream, New York office of the FWS. I have been a federal wildlife law enforcement Special Agent for one year. I received a Bachelor's degree from Mercyhurst College, in Criminal Justice and Sociology. I am a graduate of the Criminal Investigator School and FWS Special Agent Basic School at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to becoming a Special Agent, I served as a Wildlife Inspector with the FWS for approximately 5 years.

2. I have assisted in and conducted criminal investigations that have involved persons and businesses illegally commercializing protected wildlife. I have read, studied, and received training on the laws and regulations enforced by the FWS, such as the Endangered Species Act, 16 U.S.C. Sections 1531 et seq.; the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") T.I.A.S. 8249; and 18 U.S.C. Sections 371 and 554. The information obtained in this Affidavit has been obtained by me

---

[1] Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause to search, I have not set forth all of the facts and circumstances of which I am aware.

personally or has been provided to me by other FWS and Immigration and Customs Enforcement (ICE) agents or employees.

3. Your affiant has done research on elephants and the illegal trade of elephant ivory and carved art objects made from ivory. Ivory is a highly valued and sought after commodity despite the fact that commercial trade has been banned under CITES since 1976. The demand for antiques and art made of or containing elephant ivory is believed to have resulted in a significant impact on the species and a thriving black market. I am aware that some objects purporting to be antiques are actually less than 100 years old. As part of my training and experience, I am familiar with and able to identify elephant ivory and certain other types of ivory.

**The Law**

4. Title 18, United States Code, Section 554 makes it a felony for any person to fraudulently or knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or to receive, conceal, buy, sell, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

5. The Endangered Species Act, 16 U.S.C. 1531 et seq., makes it a misdemeanor for a person subject to the jurisdiction of the United States to knowingly violate any provision of the Act, or any regulation issued to implement certain subsections of the Act. 16 U.S.C. 1538(a)(1)(G).

6. The Convention on International Trade in Endangered Species ("CITES") is a treaty providing protection to fish, wildlife, and plants that may become imperiled due to the demands of international markets. CITES has been signed by over 150 countries around the world. CITES is implemented under the authority of the Endangered Species Act ("ESA") and the regulations promulgated there under 16 U.S.C. § 1538(c); 50 C.F.R. Parts 14 and 23. An animal species listed as protected within CITES cannot be exported from the United States without prior notification to, and approval from, the FWS. Species protected under CITES are listed in a series of appendices (Appendices I, II, and III). Under Appendix I of CITES, a species may be exported from the United States to a foreign country only if, prior to exportation, the exporter possesses a valid foreign import permit issued by the country of import and a valid export permit issued by the United States. Under Appendix II of CITES, a species may be exported from the United States to a foreign country only if, prior to exportation, the exporter possesses a valid CITES export permit issued by the United

States. All elephant species have a minimum level of protection under CITES as Appendix II.

### The Investigation

7. On Saturday, September 17, 2011, I participated in a wildlife inspection of outgoing passengers at JFK Airport, including China Eastern Airlines flight MU 588, bound for Shanghai, China. I interviewed LIN FENG XU, a Chinese national, after he had obtained a boarding pass, and after he had passed through security. XU was returning to China, where he lives, after having been in the United States for approximately 7 days.

8. Prior to the interview, FWS Wildlife Inspector Robin Hamilton examined XU's carry-on luggage and found 18 art objects made from carved ivory. Some of the objects had tags indicating that they had been purchased from the Dallas Art Gallery at an auction on September 7, 2011. There was also an invoice from Freeman's auction house, located in Philadelphia, indicating the purchase of items made of Elephant ivory by another individual using XU's address in China. The total value of this invoice was $19,062.50 dollars. XU's personal effects included numerous business cards and catalogs from auction houses and antique stores in the United States, including a buyer's card from Christie's auction house in New York. His passport and travel history in CBP's database indicated frequent trips to the United States, including approximately 7 trips since 2010. His passport also had Visas for England and Germany. It was evident

from a review of the passport that XU is a frequent traveler to the United States and other countries outside his native China. CBP's Treasury Enforcement Communication System (TECS) indicates that on June 20, 2010, XU filed a currency declaration for $25,000.00 dollars and indicated to CBP that he was a General Manager for "ZHE JIANG CIXI CITY ZONG HAN ZHE HAO ARTS SHOP" and would use the currency to purchase art items. Additionally, on March 13, 2011, XU filed a currency declaration while entering the United States in the amount of $60,000.00 dollars and indicated he was visiting for one month. XU stated that he stays at a private hotel or guest house in Flushing, Queens, while visiting New York. A search of XU's checked luggage found that it contained numerous art and antique objects which did not appear to contain ivory or other wildlife objects.

9. I asked XU to meet with me in a room provided by TSA and was assisted in the interview by an airline employee who translated questions and answers in Mandarin and English. XU was unable to communicate without the aid of an interpreter. I asked XU what the items in his carry-on luggage were made from. He provided various answers including: he did not know, plastic, and bone. Once confronted with an invoice indicating the item was ivory, he admitted that some might be elephant. I asked XU the value of the 18 items and he responded that he had purchased approximately $3,000 to $4,000 worth. XU initially stated that some of the items were purchased by or for his father who had a

flower shop. When confronted with an invoice indicating that the item was purchased by an "Art Shop" in Zhejiang, China, XU admitted that his father also sells art and antiques. He also admitted that the amount paid for the ivory items was more but that he was not good at numbers. XU was provided with breaks to smoke and use the restroom. After the conclusion of the interview, at approximately 5:25 p.m., I advised XU of his <u>Miranda</u> rights and subsequently I informed him that he was under arrest. XU claimed that he did not know that bringing the ivory in his luggage was illegal. XU was handcuffed and placed in my vehicle. After consultation with the Department of Justice, it was determined that XU should not be arrested. At this point, the airline interpreter was no longer present. I contacted her by phone and she provided translation *via* speaker phone. I advised XU that he was free to go, and I returned his passport. I advised him that the wildlife items made from ivory were going to remain seized. I also told XU that I would like to learn more about the ivory objects and that while he was free to leave, if he was willing, I would like for him to visit my office on Monday. I advised him that any such interview was voluntary on his part.

10. On Monday afternoon, September 19, 2011, XU arrived at my office accompanied by a friend who speaks English and who indicated that he would willing to assist by translating for XU during the interview. I indicated that this would not be

necessary since I had arranged for a Court certified Mandarin interpreter supplied by Metropolitan Translation Services. At the outset of the interview I again explained that the interview was voluntary and that XU could terminate the interview and leave at any time. I again advised him of his Miranda rights and also had the interpreter translate a FWS form waiving his right against self incrimination. After it was translated, XU signed the waiver form. After approximately one hour, the interpreter had to leave for another assignment. The interview resumed with the aid of a different court-certified Mandarin interpreter supplied by Metropolitan Translation Services who participated in the interview by telephone.

11. During the interview on September 19, 2011, after being advised of his right against self incrimination and with the aid of an interpreter, XU admitted that during the interview on September 17, 2011, he had stated that he did not know what the items in his luggage were made of and that they were plastic. Initially he claimed that he bought some on the street in New York City and so he did not know if they were actually ivory. However, he subsequently admitted that he knew the items were ivory. He also acknowledged that the value was at least $30,000 and not $3,000 to $4,000 as stated two days earlier. XU stated that he had paid $20,000 for the items that came from the Dallas Art Gallery. Xu stated that he had instructed a friend to purchase these items for him since the auction took place prior

to his arrival into the United States. He stated that he paid his friend $20,000 for the items and a finder's fee of $300. During this interview, Xu stated that all of the ivory items in his luggage were his purchases and that he intended to sell them in China. He stated that he did not mean to say that some of the purchases were for his father in the prior interview and that he had been confused on this point during the prior interview.

    12. I have reviewed the on-line catalogue from the Dallas Art Gallery auction on September 7, 2011, which is available at: http://dallasauctiongallery.auctionflex.com. I have compared the lot numbers from the tags found in XU's baggage to the lot numbers set forth in the on-line catalogue (lot numbers 119, 171, 183, 276) and have verified that they were sold at this auction which took place in Dallas, TX. According to the auction house's web page, the following items corresponding to the contents of XU's luggage and sold for the following prices: Lot #119 sold for $6,737.50 dollars. Lot #171 sold for $6,125.00 dollars. Lot #183 sold for 3,675.00 dollars. Lot #276 sold for $3,675.00 dollars.

    13. XU stated that the reason he did not initially admit that the items were ivory is that he was afraid of admitting this fact. At first, he stated that he was not sure whether ivory could be lawfully exported from the United States. XU subsequently admitted that he knew that at the time of his actions that was breaking the law of the United States and that

exporting the ivory was illegal. XU also stated that he personally packed the ivory items in tin foil because he had heard others discussing at an auction that this would disguise the outline of the object during x-ray screening. XU admitted that he knew that he was not supposed to export ivory and that he regretted his actions.

WHEREFORE, your deponent respectfully requests that defendant LIN FENG XU be dealt with according to law.

Special Agent Ryan Bessey
United States Fish & Wildlife Service

Sworn to before me this
20th day of September, 2011

S/Bloom

HONORABLE
UNITED ST
EASTERN I